**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
|    Rotondo Weirich Enterprises, Inc., et al. | : | |
| | : | Bky. No. 15-16146 ELF |
|    Debtors | : | |
| | : | JOINTLY ADMINISTERED |
| | : | |
| Rotondo Weirich Enterprises, Inc., | : | |
| | : | |
|    Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Sundt/Layton, a Joint Venture, | : | |
| | : | |
| Sundt Construction, Inc., | : | Adv. No. 17-185 |
| | : | |
| Layton Construction Company, LLC, | : | |
| | : | |
| Fidelity & Deposit Company of Maryland, | : | |
| | : | |
| Zurich American Insurance Company, | : | |
| | : | |
| Federal Insurance Company, | : | |
| | : | |
| Liberty Mutual Insurance Company, | : | |
| | : | |
| California Department of Corrections | : | |
|    and Rehabilitation, | : | |
| | : | |
|    Defendants | : | |

# M E M O R A N D U M

### I. INTRODUCTION

Debtor Rotondo Weirich Enterprises, Inc. ("the Debtor") has filed a complaint ("the Complaint"), seeking damages from Sundt/Layton, a joint venture, Sundt Construction, Inc., Layton Construction Company, LLC (collectively "Sundt/Layton") and the California

1

Department of Corrections and Rehabilitation ("the CDCR") based on alleged breaches of a construction contract.

The Debtor also seeks recovery from Fidelity & Deposit Company of Maryland, Zurich American Insurance Company, Federal Insurance Company and Liberty Mutual Insurance Company ("the Sureties") on a public works bond.

The Defendants have filed a Motion to Dismiss the Complaint ("the Motion"), asserting:

1. The court lacks jurisdiction over the claims against the CDCR based on the Eleventh Amendment to the U.S. Constitution.

2. A joint venture entity formed by the Debtor and CML RW Security, LLC ("CML") – **not the Debtor** – was the contracting party with Sundt/Layton and therefore, the Debtor lacks standing to assert a claim for breach of contract.

3. The court lacks subject matter jurisdiction under 28 U.S.C. §1334(b) to adjudicate all causes of action based on the subcontract.

4. All of the claims are subject to binding arbitration.

5. Due to the undisputed existence of an express contract, the Debtor may not assert a claim for unjust enrichment.

6. The Debtor was not licensed to do business in California.

For the reasons explained below, I will grant the Motion in part and deny it in part. Specifically, I will:

1. defer a ruling on the first three (3) grounds for dismissal stated above, all of which are based on the court's asserted lack of jurisdiction; and

2. stay all of the claims against the CDCR and Sundt/Layton pending binding arbitration of the parties' disputes.[1]

---

[1] The Defendants request that the court enforce their mandatory arbitration rights by dismissing the Debtor's claims. However, the appropriate disposition is to stay this proceeding. See In re Olympus Healthcare Grp., Inc., 352 B.R. 603, 612 (Bankr. D. Del. 2006) (citing 9 U.S.C. §3).

As a result of this disposition, it is unnecessary to discuss the fifth and sixth grounds for dismissal stated above.

## II. PROCEDURAL HISTORY

On August 27, 2015, the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code. On November 20, 2015, Sundt/Layton filed Proof of Claim No. 105, alleging it was owed an unliquidated amount for the Debtor's breaches under the Subcontract.

On June 28, 2017, the Debtor filed the Complaint. The Defendants filed a Motion to Dismiss the Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on September 29, 2017.[2] Both sides filed a memorandum and supplemental memorandum in support of their respective positions, the last of which was filed on January 31, 2018.

## III. THE COMPLAINT

### A. Facts

The well-pled facts in the Complaint and the attached documents permit me to describe the case straightforwardly, in the light most favorable to the Debtor, without accepting any of the Debtor's legal conclusions. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).[3]

---

[2] Fed. R. Civ. P. 12 is incorporated by Fed. R. Bankr. P. 7012.

[3] In resolving a motion to dismiss a complaint that raises a facial challenge to the court's subject matter jurisdiction under Fed. R. Civ. P.12(b)(1) the court accepts as true all well-pled facts alleged in the complaint. See, e.g., In re Star Grp. Commc'ns, Inc., 568 B.R. 616, 622 (Bankr. D.N.J. 2016); In re Merritt, 529 B.R. 845, 858–59 (Bankr. E.D. Pa. 2015), aff'd, 2016 WL 930696 (E.D. Pa. Mar. 10, 2016); In re Funches, 381 B.R. 471, 483 (Bankr. E.D. Pa. 2008). The same principle applies to a
*[fn. cont.]*

On or about March 13, 2014, the CDCR executed a contract ("the Prime Contract") with Sundt/Layton, as general contractors, for the construction of a prison ("the Donovan Project").

On March 26, 2014, Sundt/Layton, in turn, executed a contract ("the Subcontract") with "Rotondo Weirich Enterprises, Inc. / CML RW Security, LLC d/b/a/ RW Companies" to do certain work on the Donovan Project. The Debtor's President/CEO signed the Subcontract on behalf of "RW Companies." The Subcontract provided that the Debtor was responsible for "the Precast Module scope of work" and CML, (at the time, a subsidiary of the Debtor), was responsible for the separate "Detention Equipment and Security Electronics scope of work." (Ex. C ¶1.1).

In connection with the Prime Contract, the Sureties provided a payment bond and performance bond in the total amount of $168,762,000.00.

The Debtor did some of the work contemplated by the Subcontract and contends that it has not been fully paid. In addition, the Debtor incurred debts to its own sub-subcontractors. The Debtor last worked on the project on February 2, 2016. CML completed its work on the project in March 2017. The Debtor is now unable to determine what amounts were paid to CML or directly to its sub-subcontractors,

The Debtor contends that Sundt/Layton owes it a presently undetermined amount for the work it performed on the Donovan Project.

---

motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). See, e.g., Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Taliaferro v. Darby Twp. Zoning Board, 458 F.3d 181, 188 (3d Cir. 2006).

**B. Claims Asserted**

The Complaint alleges these seven (7) counts against some or all of the Defendants, based on contract, statutory and equitable theories of recovery:

- Count I - Accounting (against Sundt/Layton)
  The Debtor demands to see Sundt/Layton's books to determine which entities were paid for which work, and if sub-subcontractors were paid directly by Sundt/Layton.

- Count II - Breach of Contract (against Sundt/Layton)
  The Debtor seeks payment under the Subcontract for work it performed, with the amount determined after an accounting.[4]

- Count III - Claim on Bonds (against the Sureties)
  The Debtor asserts a private right of action to recover unpaid amounts directly from a public works performance bond. See Cal. Civ. Code §9558.

- Count IV - Statutory Attorney's Fees (against all Defendants)
  The Debtor seeks to recover attorney's fees as part of its "action to enforce the liability on the bond." See Cal. Civ. Code §9564(c).[5]

- Count V - California Prompt Pay Statute (against Sundt/Layton)
  The Debtor asserts that it did not get paid for completed work within the required time period. As a result, the Debtor asserts that it is entitled to recover the amount due, plus 2% per month plus fees and costs. See Cal. Civ. Code §8818.

- Count VI - Unjust Enrichment/Quantum Meruit (against all Defendants)
  If all of the above claims fail, the Debtor asserts that it is entitled to a recovery for the value of those benefits it conferred through its work based on a theory of unjust enrichment and/or quantum meruit.

- Count VII - Objection to Proof of Claim 105 (against Sundt/Layton)
  The Debtor objects to Sundt/Layton's proof of claim and requests that it be disallowed.

---

[4] In Paragraph 24 of the Complaint, the Debtor asserts that it owes $1,077,395.00 to its contractors. This would seem partially to liquidate the Debtor's claim. However, later in the Complaint, in Paragraphs 32-33, the Debtor alleges that it does not know the total amount that Sundt/Layton may have paid to the Plaintiff's subcontractors.

[5] Cal. Civil Code §9564(a) authorizes a claimant to enforce the liability of a surety on a payment. Section 9564(c) states that in an action "to enforce the liability on the bond," the court shall award the prevailing party a reasonable attorney's fee. It is unclear why the Debtor asserts this claim against "all Defendants."

## IV.  DISCUSSION

### A.  Deferral of the Jurisdictional Issues

**1.**

In this adversary proceeding, the Defendants have raised three (3) issues that go to this court's subject matter jurisdiction: Eleventh Amendment immunity; the Debtor's standing;[6] and the lack of subject matter jurisdiction under 28 U.S.C. §1334(b).  <u>See</u> Part I, <u>supra</u>.

As a general rule, a federal court should first determine whether it has jurisdiction over an action before considering the merits.  <u>See, e.g.</u>, <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998); <u>In re Mullarkey</u>, 536 F.3d 215, 220–21 (3d Cir. 2008); <u>Packard v. Provident Nat'l. Bank</u>, 994 F.2d 1039, 1049 (3d Cir. 1993).

---

[6]  The Court of Appeals has explained how the concepts of standing and jurisdiction are related:

> Article III of the United States Constitution limits the power of the federal judiciary to cases and controversies. For a federal court to exercise jurisdiction under Article III, plaintiffs must allege—and eventually prove—that they having standing to pursue their claims. The doctrine of standing emerged from the traditional understanding of a case or controversy in order to ensure that federal courts do not exceed their [constitutional] authority by usurp[ing] the powers of the political branches.  The doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.
>
> The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing the minimal requirements of Article III standing: (1) . . . an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  In assessing whether a plaintiff has carried this burden, we separate our standing inquiry from any assessment of the merits of the plaintiff's claim.

<u>Cottrell v. Alcon Labs.</u>, 874 F.3d 154, 161–62 (3d Cir. 2017) (quotations and citations omitted) (brackets in original).

This principle is qualified, however, by the "leeway" accorded to the court "to choose among threshold grounds for denying audience to a case on the merits." Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999)) (internal and additional citations omitted); see also Kelly v. Maxum Specialty Ins. Grp., 868 F.3d 274, 280 n.3 (3d Cir. 2017) (describing various types of non-merits dismissals permitted before addressing subject matter jurisdiction). Thus, it is not necessarily mandatory for a federal court to rule on its subject matter jurisdiction if a case is subject to another, non-merits disposition.

For the reasons explained below, I will exercise my discretion to resolve the Motion on a different, non-merits, threshold ground (i.e., mandatory arbitration) without deciding the jurisdictional issues raised by the Defendants.

**2.**

First, I will explain why it is appropriate to defer resolution of the Eleventh Amendment immunity issue.

The Eleventh Amendment to the U.S. Constitution expressly renders a state immune from liability for damages in a suit brought in federal court by "[c]itizens of another [s]tate." The Eleventh Amendment also immunizes a state from damage suits brought in federal courts by its own citizens. Dellmuth v. Muth, 491 U.S. 223, 229 n.2 (1989). [7]

Eleventh Amendment immunity applies both to the state and any entity closely enough related to be considered an "arm of the state." E.g., Karns v. Shanahan, 879 F.3d 504, 512–13

---

[7] The immunity defense is subject to two (2) exceptions: (1) Congress may authorize such a suit in exercising a power granted under the Constitution; (2) a state may waive its immunity and consent to be sued. See Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); Koslow v. Commonwealth of Pa., 302 F.3d 161, 168 (3d Cir. 2002). Neither of these exceptions is at issue here.

(3d Cir. 2018); Maliandi v. Montclair State Univ., 845 F.3d 77, 82-3 (3d Cir. 2016). Generally, speaking, suits against a state agency or a state department are considered to be suits against a state which are barred by the Eleventh Amendment. Geis v. Bd. of Educ. of Parsippany-Troy Hills, Morris Cty., 774 F.2d 575, 580 (3d Cir. 1985); Addlespurger v. Wecht, 2018 WL 1412409, at *5 (W.D. Pa. Mar. 21, 2018).

To determine whether an entity is an "arm of the state," the court must determine:

(1) Whether the money that would pay the judgment would come from the state (whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);

(2) The status of the agency under state law (this includes four factors - how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and

(3) What degree of autonomy the agency has.

Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989) (en banc).

The Fitchik inquiry has been described as "fact-intensive." Karns, 879 F.3d at 513. The party asserting immunity bears the burden of production and persuasion. Maliandi, 845 F.3d at 82; Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006).

In light of the factual nature of the Eleventh Amendment immunity analysis required by Fitchik, a motion to dismiss based on an Eleventh Amendment immunity defense of a defendant asserting that it is an "arm of the state," should be considered a "factual," rather than a "facial" challenge to the court's subject matter jurisdiction. See Orden v. Borough of Woodstown, 181 F. Supp. 3d 237, 243–44 (D.N.J. 2015); But see, e.g., Brzozowski v. Pennsylvania Tpk. Comm'n, 165 F. Supp. 3d 251, 259 (E.D. Pa. 2016); Sixth Angel Shepherd Rescue Inc. v. West, 790 F.

Supp. 2d 339, 349 (E.D. Pa. 2011).[8] Yet, neither the Defendants nor the Debtor have presented, or even requested, the opportunity to present any evidence extrinsic to the Complaint and attached exhibits.[9] Nor have the parties parsed the relevant California statutes and regulations to marshal competing arguments regarding the proper characterization of the CDCR under the Fitchik standards.[10]

---

[8]  In the text, I have cited only two (2) of the vast number of cases that repeat the mantra that assertions of Eleventh Amendment immunity are "facial" Rule 12(b)(1) attacks on the court's jurisdiction and that my statement in the text is contrary to this conventional view. In many of the decisions, the courts mention that the movant offered no evidence. Rather than characterizing those motions as facial jurisdictional challenges, perhaps they are better described as factual challenges in which the movant did not meet its burden.

[9]  To be fair, there are some facts in the record. As the CDCR points out, there are two (2) references in Ex. A. to the Complaint that the CDCR is an arm of the State of California. On March 13, 2014, the CDCR sent Sundt-Layton a letter enclosing the Prime Contract for review and execution. In that letter, the CDCR stated that on the required certificate of insurance, the listing should read, "State of California, California Department of Corrections and Rehabilitation (CDCR)." Also, on a signature page, the Prime Agreement uses the heading "State of California" above the signature line for the agency identified as the California Department of Corrections and Rehabilitation."

These are probative facts, but fall short of establishing the record necessary to make the determination mandated by Fitchik.

[10]  In seeking dismissal, the CDCR relies upon prior reported decisions in the Ninth Circuit that have held that the CDCR is an arm of the state, immune from damage claims under the Eleventh Amendment. See Brown v. California Dep't of Corr., 554 F.3d 747, 752 (9th Cir. 2009); Palismo v. Cal. Dep't of Corr., 2005 WL 1939854 (9th Cir. Aug. 15, 2005); Stroman v. Cal. Dep't of Corr. & Rehab., 2014 WL 2208174, at *1 (E.D. Cal. May 28, 2014); Peterson v. Gore, 2013 WL 5230245, at *9 (E.D. Cal. Sep. 16, 2013); Hopkins v. Cal. Dep't of Corr. & Rehab., 2008 WL 2788164, *2 (N.D. Cal. July 18, 2008). However, not surprisingly insofar as they are cases from another Circuit, none of the cases cited appear to have engaged in the analysis mandated by Fitchik, or any similar analysis before reaching its conclusion.

I also note that, in this Circuit, in evaluating Eleventh Amendment immunity asserted at the Rule 12(b) stage, numerous courts have relied upon prior reported decisions in finding state-related entities or agencies to be arms of the state, immune from federal court damage actions. See Fox v. Bayside State Prison, 2018 WL 1136949, at *1 (3d Cir. Mar. 2, 2018); Bartlett v. Kutztown Univ., 2015 WL 766000, at *4 (E.D. Pa. Feb. 23, 2015); Borrell v. Bloomsburg Univ., 955 F. Supp. 2d 390, 399

*[fn. cont.]*

In these circumstances, i.e., the existence of both a paltry record and an independent non-merits ground for resolving the Motion (i.e., mandatory arbitration), it is appropriate to defer any ruling on the Eleventh Amendment immunity defense.[11]

---

(M.D. Pa. 2013); Tulli-Makowski v. Cmty. Educ. Centers, Inc., 2013 WL 1987219, at *3 (D.N.J. May 13, 2013); M & M Stone Co. v. Pa., Dep't of Envtl. Prot., 2008 WL 4467176, at *14–15 (E.D. Pa. Sept. 29, 2008); O'Hara v. Ind. Univ. of Pa., 171 F. Supp. 2d 490, 495 (W.D. Pa. 2001).

The use of precedent in this manner may be based on an unexpressed notion that the Fitchik test was designed for state related entities that have some, but not all of the characteristics of an arm of the state (like public authorities and universities), and not for state agencies that operate governmental functions like the prisons or the courts. Or, perhaps, it just seems obvious that a state agency that bears the name of the state and that operates the state's prisons is an "arm of the state."

Nevertheless, Third Circuit precedent suggests that Fitchik provides the sole test in all cases. Therefore, in resolving a motion under Rule 12(b)(1), I have difficulty reconciling the use of precedent alone to satisfy the analysis mandated by Fitchik. See Karns, 879 F.3d at 513-14 ("[E]ach case must be considered on its own terms, with courts determining and then weighing the qualitative strength of each individual [Fitchik] factor in the unique factual circumstances at issue"). Even if a factual submission is not necessary, at a minimum, the court needs to reference the relevant statutory provisions relating to the defendant entity to determine whether it is entitled to invoke Eleventh Amendment immunity. See, e.g., In re Kahl, 240 B.R. 524, 531 (Bankr. E.D. Pa. 1999) (after observing that the parties failed to address Fitchik, the court evaluated the immunity claims based on its own independent research and review of the relevant state statutes).

[11] As noted earlier, the enforcement of the mandatory arbitration provision results in a stay of this proceeding, not dismissal. See n.1, supra.

I acknowledge that there may be tension between the retention of jurisdiction in this manner, in light of the dispute over the very existence of jurisdiction. However, this disposition is consistent with Sinochem, where the Supreme Court stated, "[J]urisdiction is vital only if the court proposes to issue a judgment on the merits." 127 S. Ct. at 1191–92.

I also note that it may never be necessary for the court to consider the entry of a merits judgment. The need will arise (along with the necessity of resolving the Eleventh Amendment issue) only if the Debtor obtains a favorable arbitration award against the CDCR **and** seeks to confirm that award in this court. The litigation between the Debtor and the CDCR could play out in many other ways that would not further involve this court. In any event, if necessary, the parties and the court can revisit the jurisdictional issue well before this court enters any kind of merits judgment.

**3.**

Next, I will explain why I will defer resolution of the Defendants' standing and §1334(b) jurisdictional arguments.

Both of these arguments are intertwined with and dependent on the merits of the Debtor's claim, i.e., the outcome depends on whether the Debtor or another entity -- a joint venture -- is the counterparty to the Subcontract with Sundt/Layton.[12]

The Defendants assert that "RW Companies," a joint venture of the Debtor and CML, was the entity that contracted with Sundt/Layton. As a result, according to the Defendants, the Debtor lacks standing to assert the rights of RW Companies.

The Defendants further suggest that even if this action were brought in the name of the proper plaintiff, RW Companies, this court lacks subject matter jurisdiction over the claim. In support of this variant of their jurisdictional argument, the Defendants analogize the relationship of the Debtor to the joint venture to that of a parent to a subsidiary corporation. Then, they cite cases holding that litigation involving the subsidiary that affects its value to a bankruptcy-debtor-parent is not within the scope a bankruptcy court's "related to" jurisdiction under 28 U.S.C. §1334(b). (Defendants' Motion at 9; Supplemental Memorandum at 6).[13]

The flaw in the Defendants' arguments is that they are grounded in facts that are in dispute and not amenable to resolution in a Rule 12(b)(1) facial attack on the court's jurisdiction. See Kerns v. U.S., 585 F.3d 187, 193 (4th Cir. 2009) (explaining that when the "jurisdictional

---

[12] I note that if the Debtor is not a party to the Subcontract, it has no right to recover on the contract and its claim would be subject to dismissal for failure to state a claim under Rule 12(b)(6).

[13] In support of their argument, the Defendants cite In re Winstar Commc'ns Inc., 284 B.R. 40, 51 (D. Del. 2002); In re Mordini, 491 B.R. 567, 571 (Bankr. D. Colo. 2013); Tower Auto. Mex. v. Grupo Proeza, S.A., 356 B.R. 598, 602 (Bankr. S.D.N.Y. 2006).

facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery"); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1350, at nn. 73-75 & accompanying text (3d ed. West 2017) (the court has the discretion to defer resolving a jurisdictional attack that is simultaneously a merits attack pending discovery and further development of the record); see also First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 378–79 (S.D.N.Y. 2002) (when the issue of standing is intertwined with the merits, courts should employ the Rule 56 summary judgment standard).

In the Complaint, the Debtor alleges that it entered into the Subcontract with Sundt/Layton. (Compl. ¶18). This is a fact that must be accepted as true for purposes of the Defendants' facial jurisdictional attack under Rule 12(b)(1).

It is accurate, as the Defendants point out, that the subcontractor in the Subcontract is identified as "Rotondo Weirich Enterprises, Inc./CML RW Security LLC, dba RW Companies" and that the Debtor's principal signed the contract as President/CEO of "RW Companies." (Compl. Ex. C). Those additional facts create an ambiguity as the identity of the party to the Subcontract, but standing alone, without a more developed evidentiary record, do not establish that a joint venture, rather than the Debtor, was the party to the Subcontract.[14] There are various

---

[14] The existence of a joint venture depends on the intention of the parties to the alleged venture. Pepper, N.A. v. Expandi, Inc., 2016 WL 1611039, at *2 (N.D. Cal. Apr. 22, 2016). A joint venture would have to be proved by showing that the Debtor and CML had an "agreement under which they have a community of interest, that is, a joint interest, in a common business undertaking, an understanding as to the sharing of profits and losses, and a right of joint control." Chambers v. Kay, 29 Cal. 4th 142, 151 (Cal. 2002) (citation omitted). Whether a joint venture exists is a question of fact, to be determined by the factfinder. Unruh-Haxton v. Regents of Univ. of Cal., 162 Cal. App. 4th 343, 370 (2008).

The Debtor has pled that it was a party to the Subcontract and that CML and the
*[fn. cont.]*

explanations for the manner in which the contracting party was identified in the Subcontract that are consistent with the Debtor's allegations and, at this stage of the proceeding, I must draw all inferences in favor of the Debtor.

In light of this factual issue, which precludes a determination that the Debtor was not a party to the Subcontract, the Defendants' request for dismissal based on the Debtor's purported lack of standing and the absence of §1334(b) jurisdiction is premature, but may be raised at a later time.  See Frett-Smith v. Vanterpool, 511 F.3d 396, 398 n.3 (3d Cir. 2008) (citing Kontrick v. Ryan, 540 U.S. 443, 455 (2004)) (generally, litigant may raise a court's lack of subject matter jurisdiction at any time, even "initially at the highest appellate instance") (additional citations omitted).

### B. Mandatory Arbitration

The next issue in the dismissal request hierarchy is the Defendants' contention that the Debtor's claims are subject to mandatory arbitration.  As explained below, I agree that the Subcontract mandates arbitration of the parties' disputes.  As a result, in the end, the only active, remaining claims are the Debtor's claims against the Sureties.[15]

---

Debtor were assigned different work and paid based solely upon that work, as though they were separate, unrelated entities. (Complaint ¶¶ 19, 34).  The Subcontract contains contractor license numbers for the Debtor and CML, as though they were different entities.  (Ex. C at 24).  Thus, the Complaint's allegations do not definitively establish the existence of a joint venture.

[15]     The Defendants' submissions are not clear on this point, but they may be asserting that the Debtor's claims against the Sureties should be dismissed because the asserted joint venture was not licensed to business in California.  See Cal. Bus. & Prof. Code §7029.1(a).  If so, this ground for the Motion is denied.  It too requires a resolution of the factual issue as to the existence of a joint venture.

**1.**

The Subcontract contains an arbitration clause which states that disputes between Sundt/Layton and the Debtor shall be resolved by litigation in Utah, unless Sundt/Layton elects binding arbitration, which shall be conducted in Salt Lake City. (Ex. C ¶10.2.4). Sundt/Layton may elect arbitration within a reasonable time after it receives notice of a dispute. (Ex. C ¶10.3.1).

The Complaint makes no allegations regarding arbitration. It cites the statutory grounds for bankruptcy court jurisdiction and venue, and alleges that this is a core proceeding. Based on the Prime Contract and the Subcontract, both exhibits to the Complaint, the Defendants argue that all counts "based on the Subcontract" are subject to mandatory arbitration and must be dismissed. In its response to the Motion, the Debtor argues that even if arbitration is mandatory under the Subcontract, this court should not enforce those contractual provisions because doing so would conflict with the fundamental purposes of the Bankruptcy Code.

As explained below, the mandatory arbitration provision in the Subcontract must be enforced by this court.

**2.**

The two (2) leading cases in this Circuit on the effect of arbitration clauses in bankruptcy proceedings are Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 885 F.2d 1149 (3d Cir. 1989) and In re Mintze, 434 F.3d 222 (3d Cir. 2006).

Hays involved claims for federal and state securities law violations and transfer avoidance pursuant to 11 U.S.C. §544(b) asserted by a chapter 11 trustee. In Mintze, a chapter 13 debtor sought to enforce her asserted right of rescission under the Truth in Lending Act, 15

U.S.C. §§ 1601 et seq. In each case, the underlying contract provided for mandatory arbitration of disputes between the parties.

The Hays court held that all of the trustee's claims that were derived from the debtor were subject to the arbitration clause, but the non-derivative §544(b) claim was not. Hays, 885 F.2d at 1155.

More pertinent to the instant case, the court also held that under the Federal Arbitration Act, 9 U.S.C. §§1 et seq., ("the FAA"), the bankruptcy court

> **lacked the authority and discretion to deny enforcement of the arbitration clause unless** [the trustee] had met [his] burden of showing that **the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of an arbitration clause** in a case of this kind, that is, a non-core proceeding brought by a trustee to enforce a claim of the [bankruptcy] estate . . .

Hays, 885 F.2d at 1156–57 (emphasis added) (citing and applying Shearson/Am. Exp., Inc. v. McMahon, 482 U.S. 220 (1987)).

In reaching its conclusion, the Hays court considered and rejected the argument that bankruptcy policy favoring the centralization of all disputes involving the debtor and the debtor's property in one court (the bankruptcy court) constitutes a "conflict" with the FAA sufficient to warrant the exercise of the court's discretion and authority to decline to enforce a mandatory arbitration clause:

> Whatever relevance these observations may have in other bankruptcy contexts, they do not help [the trustee] here. While one can argue with some force that the Bankruptcy Reform Act of 1978 was intended to focus all bankruptcy related matters in a single bankruptcy court with power of summary disposition, the 1984 Amendments confer on the district court original but not exclusive jurisdiction over suits of this character. 28 U.S.C.A. § 1334(b). Thus, it is clear that in 1984 Congress did not envision all bankruptcy related matters being adjudicated in a single bankruptcy court.

Hays, 885 F.2d at 1157 (footnote and emphasis omitted).

Nor are concerns about potential "inefficient delay, duplicative proceedings, or collateral estoppel effect . . . substantial enough to override the policy favoring arbitration." Id. at 158 (footnote omitted).

In Mintze, the Court of Appeals rejected the debtor's attempt to limit Hays to its facts, i.e., complaints asserting non-core claims, holding that "the standard . . . articulated in Hays applies equally to core and non-core proceedings." 434 F.3d at 231.

The Mintze court reiterated:

> Where an otherwise applicable arbitration clause exists, a bankruptcy court lacks the authority and discretion to deny its enforcement, unless the party opposing arbitration can establish congressional intent . . . to preclude waiver of judicial remedies for the statutory rights at issue.

Id. (emphasis omitted).

The Mintze court repeated the oft-stated passage from McMahon and Hays, that Congressional intent to override the FAA and the enforcement of a mandatory arbitration provision can be discerned in one (1) of three (3) ways: (1) the statute's text, (2) the statute's legislative history, or (3) an inherent conflict between arbitration and the statute's underlying purposes. Mintze, 434 F.3d at 229.[16]

---

[16]    My research reveals no post-Mintze reported cases in which any court in the Third Circuit refused to enforce an arbitration clause because of a fundamental conflict with the Bankruptcy Code.

In Hays, the court held that the trustee's 11 U.S.C. §544(b) claims were not subject to mandatory arbitration, but not because of a conflict with the Bankruptcy Code. Rather, the court reasoned that, under §544(b), the trustee's claim derived from a creditor, not from the debtor. Since the creditor was not a party to the contract containing an arbitration clause and therefore could not be bound it, neither was the trustee. See 885 F.2d at 1155.

Outside of the Third Circuit, there are reported decisions holding that a debtor or trustee cannot be compelled to arbitrate claims created by the Bankruptcy Code itself. See, e.g., In re Anderson, 884 F.3d 382 (2d Cir. 2018) (compelling arbitration of claim for violation of the debtor's discharge would conflict with the purposes of the Bankruptcy Code); In re Eber, 687 F.3d 1123, 1130–31 (9th Cir. 2012)

*[fn. cont.]*

**3.**

Except for the objection to Sundt/Layton's proof of claim, this case is a non-core proceeding, in which the Debtor seeks to enhance the bankruptcy estate by enforcing its pre-petition contractual rights against Sundt/Layton. None of the counts seeking an affirmative recovery are premised on a Code-based cause of action. Facially, all of the claims against Sundt/Layton are within the scope of the arbitration clause in the Subcontract. These circumstances render this case indistinguishable from Hays.

The Debtor's attempts to identify a conflict between the arbitration clause and the Bankruptcy Code are unconvincing.

The Debtor argues that enforcing arbitration would undermine the bankruptcy process's role as a centralized and collective proceeding for adjudicating and dealing with claims by and against the Debtor. (Debtor's Objection ¶¶55-58). This argument was considered and rejected in Hays, a precedential decision that is binding on this court.

---

(allowing an arbitrator to decide issues closely intertwined with dischargeability would conflict with the underlying purposes of the Bankruptcy Code); In re Rushing, 443 B.R. 85, 96 (Bankr. E.D. Tex. 2010) (complaint under §362(k) not subject to mandatory arbitration because the rights asserted are conferred by the Bankruptcy Code, not the debtor's pre-petition legal or equitable rights); In re Grant, 281 B.R. 721, 725 (Bankr. S.D. Ala. 2000) (in action to enforce the automatic stay, arbitration clause conflicts with the Bankruptcy Code because compelling arbitration would allow an arbitrator to decide whether or how to enforce a federal injunction under §362). But see In re Williams, 564 B.R. 770, 783–84 (Bankr. S.D. Fla. 2017) (arbitration of dischargeability of debt under Code provisions as to which the bankruptcy court does not have exclusive jurisdiction does not conflict with the Bankruptcy Code).

This issue is not presented here.

The Debtor also seeks to depict its claims as turnover claims, arguing that turnover actions under 11 U.S.C. §542 are not subject to mandatory arbitration. However, the Debtor's claims are not bona fide §542 turnover claims; this argument is not available to the Debtor.[17]

It is settled that a turnover action under 11 U.S.C. §542 does not lie "to liquidate contract disputes or otherwise demand assets whose title is in dispute." Phila. Entm't Dev. Partners, L.P., 549 B.R. 103, 143 (Bankr. E.D. Pa. 2016), rev'd on other grounds, 879 F.3d 492 (3d Cir. 2018) (quoting U.S. v. Inslaw, Inc., 932 F.2d 1467, 1472 (D.C. Cir.1991) and collecting cases)).[18] Rather, turnover is a remedy "to obtain [possession of] what is acknowledged to be property of the bankruptcy estate." In re Asousa P'ship, 264 B.R. 376, 384 (Bankr. E.D. Pa. 2001) (collecting cases).

It is patently clear that the Debtor's claims in this case are disputed contract claims that are not encompassed by 11 U.S.C. §542.

---

[17] Therefore, I need not decide the legal premise of the Debtor's argument for overcoming the effect of the mandatory arbitration provision, i.e., that compelling arbitration of §542 turnover claims conflicts with the purposes of the Bankruptcy Code. Case law is divided on the issue. Compare In re E & G Waterworks, LLC, 571 B.R. 500, 509 (Bankr. D. Mass. 2017) with Gavilon Grain LLC v. Rice, 2017 WL 3508721, at *3 (E.D. Ark. Aug. 16, 2017); In re Cardali, 2010 WL 4791801, at *11–12 (Bankr. S.D.N.Y. Nov. 18, 2010).

[18] See also In re FLR Co., Inc., 58 B.R. 632, 634 (Bankr. W.D. Pa. 1985):

> Implicit in the bankruptcy concept of turnover is the idea that the property being sought is clearly the property of the Debtor but not in the Debtor's possession. Turnover . . . is not the provision of the Code to determine the rights of the parties in legitimate contract disputes.

**4.**

The Subcontract contains a "common question" arbitration provision: all disputes involving the Debtor, Sundt/Layton, the CDCR and any other subcontractors or suppliers involving a common question of fact or law shall be heard in the same arbitration proceeding. (Ex. C. ¶10.3.2).

There appears to be no dispute that the Debtor's claims against the CDCR involve common questions of fact or law with the Debtor's claims against Sundt/Layton. Therefore, the Debtor must submit those claims to arbitration, rather than to this court.[19]

**5.**

For a number of reasons, the Debtor's claims against the Sureties are not subject to mandatory arbitration.

The bond documents have no arbitration clause. Disputes against the bonds go to court: "Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located. . . ." (Compl. Ex. B, ¶9). The arbitration provisions of the Prime Contract and the Subcontract do not apply because the Sureties are not parties to those contracts. Nor can the Sureties be pulled into arbitration provision of the Subcontract via the "common question" clause because that clause applies only to subcontractors, suppliers and materialmen. (Ex. C. ¶10.3.2). Bond sureties do not fit into any of these categories.

---

[19] The CDCR is not a party to the Subcontract. Thus, while the "common question" provision of the Subcontract compels the Debtor to arbitrate disputes with the CDCR, that does not mean that CDCR is compelled to arbitrate its disputes with the Debtor.

The claims against the Sureties will not be stayed for arbitration.[20]

## VI. CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss the Complaint will be granted in part and denied in part.

An order consistent with this Memorandum will be entered.

**Date: April 16, 2018**

                **ERIC L. FRANK**
                **U.S. BANKRUPTCY JUDGE**

---

[20] In light of the interrelationship between the Debtor's claims against the Sureties and the claims stayed for arbitration, the Debtor may have practical and logistical difficulties in prosecuting this adversary proceeding prior to the determination and liquidation of their claims against Sundt/Layton in the arbitration. Consequently, in order to determine how best to proceed with the pretrial management of this adversary proceeding, I will hold a pretrial conference to solicit input from the parties.